UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>APPROXIMATELY $47,000,000 IN PROCEEDS FROM THE SALE OF 996,726 BARRELS OF PETROLEUM-PRODUCT PREVIOUSLY STORED AT JANAF STORAGE FACILITY IN CROATIA,<br><br>    Defendant In Rem. | Civil Action No. 25-0897 |

## UNITED STATES' VERIFIED
## COMPLAINT FOR FORFEITURE IN REM

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia and the Counterintelligence and Export Control Section of the National Security Division, which brings this verified complaint for forfeiture in a civil action in rem against the defendant property, namely approximately $47,000,000 in proceeds (the "Defendant Property") from the sale of 996,726 barrels of petroleum-product previously stored at the Jadranski naftovod ("JANAF") storage facility in Omišalj, Croatia (the "Petroleum Product"), and alleges as follows:

### NATURE OF ACTION AND THE DEFENDANT IN REM

1.      This in rem forfeiture action arises out of an investigation by Homeland Security Investigations ("HSI") and the Federal Bureau of Investigation ("FBI"). Specifically, the United States is investigating Iran's transportation and sale of oil products for the benefit of sanctioned Iranian entities, including the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Qods Force ("IRGC-QF"). This action seeks to forfeit the proceeds from the sale of the Petroleum

Product, which originated from an oil terminal in Iran, where it was originally loaded onto a very large crude carrier ("VLCC") tanker that, on at least seven occasions, has carried Iranian oil that originated from Iranian oil facilities run by the National Iranian Oil Corporation ("NIOC"). That vessel utilized surreptitious means in order to hide the Petroleum Product's Iranian origin and to transfer the Petroleum Product onto other vessels moving the cargo into foreign commerce by, and for the benefit of, NIOC, the IRGC and the IRGC-QF, each of which has been designated by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.

2.     The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(1) as foreign assets: (i) of the IRGC or IRGC-QF, a designated foreign terrorist organization, which has engaged in the planning and perpetration federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property; and (ii) affording a person a source of influence over the IRGC or IRGC-QF.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.     Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2).

## FACTS GIVING RISE TO FORFEITURE

I.     **Relevant Participants in the Iranian Oil Industry**

    A.     **The Islamic Revolutionary Guard Corps and the Islamic Revolutionary Guard Corps-Qods Force.**

5.     The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations. The IRGC-QF's "support for

terrorism [is] well known[.]" *Hake v. Bank Markazi Jomhouri Islami Iran*, Civ. A. No. 17-0114 (TJK), 2022 WL 4130837, at *11 (D.D.C. Sept. 12, 2022).

6.      The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking."  https://home.treasury.gov/news/press-releases/tg1718.

7.      According to OFAC, "[t]he IRGC and its major holdings . . . have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses." https://home.treasury.gov/news/press-releases/sm703.

8.      The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil.  Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries . . . to obfuscate its involvement in selling Iranian oil."  https://home.treasury.gov/news/press-releases/sm767; *see also* https://home. treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies.").

9.      The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." https://home.treasury.gov/news/press-releases/sm703.

10.      The IRGC generates substantial revenues from the sale of petroleum products.  For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime.  These shipments, taken collectively, sold for more than half a billion dollars.  The

same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars." https://home.treasury.gov/news/press-releases/sm767.

11.    The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities.  For example, OFAC has found that: "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East." https://home.treasury.gov/news/press-releases/sm885; *see also* https://home.treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad.").

12.    The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." https://home.treasury.gov/news/press-releases/sm885.

13.    On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters." https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm.  In part, the Department of State and OFAC found that the IRGC-QF "provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command[.]" *Id.*

14.    As part of its enforcement efforts, OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries.  It also lists

individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country specific. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs" and the identities are collected on the SDN List maintained by OFAC. *See* https://ofac.treasury.gov/specially-designated-nationals-and-blocked-persons-list-sdn-human-readable-lists. SDNs assets are blocked, and United States persons are generally prohibited from dealing with them.

15.    On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm0177.

16.    On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1189. *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/. The announcement noted, in part, that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with the IRGC, you will be bankrolling terrorism." *Id.*

17.    On April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF. *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html. That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." *Id.*

18.    On April 15, 2019, the United States Secretary of State designated the IRGC as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act. To date,

the IRGC remains a designated foreign terrorist organization.[1] *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

19.    IRGC-QF official Rostam Qasemi (a/k/a Rostam Ghasemi), who previously served as the Iranian Minister of Petroleum from 2011 to 2013, "manage[d] a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil." https://home.treasury.gov/news/press-releases/sm767. On September 4, 2019, OFAC designated Qasemi "for acting for or on behalf of the IRGC-QF and IRGC-QF Commander Qasem Soleimani." *Id.* Following the death of Soleimani in 2020, Qasemi "assumed a portion of former IRGC-QF Commander Qasem Soleimani's ("Soleimani") role in facilitating shipments of oil and

---

[1]    Also known as IRGC; Islamic Revolutionary Guards Corps; Islamic Revolution Guards Corps; Iran's Revolutionary Guard Corps; Islamic Revolutionary Corps; IRG; The Iranian Revolutionary Guards; Islamic Revolutionary Guards; Iran's Revolutionary Guards; Revolutionary Guards; Revolutionary Guard; Army of the Guardians of the Islamic Revolution; The Army of the Guardians of the Islamic Revolution; AGIR; Pasdaran; Pasdaran-e Inqilab; Pasdarn-e Enghelab-e Islami; Sepah; Sepah Pasdaran; Sepah-e Pasdaran-e Enghelab-e Eslami; Sepah-e Pasdaran Enghelab Islami; Islamic Revolutionary Guard Corps-Qods Force; IRGC-Quds Force; IRGC-QF; Qods Force; Sepah-e Qods; Jerusalem Force; Al Qods; Islamic Revolutionary Guard Corps (IRGC)-Qods Force; Pasdaran-e Enghelab-e Islami (Pasdaran); Sepah-e Qods (Jerusalem Force); Qods (Jerusalem) Force of the IRGC; Quds Force; IRGC Ground Forces; Islamic Revolution Guards Corps Ground Force; Basij; Baseej; Basij-e Melli; Islamic Revolution Guards Corps Resistance Force; Basij Resistance Forces; Mobilization of the Oppressed; Mobilization of the Oppressed Unit; Mobilization of the Oppressed Organization; Organization of the Mobilisation of the Oppressed; Sazman Basij Melli; Sazman-e Moghavemat-e Basij; Sazeman-e Basij-e Mostazafan; Vahed-e Basij-e Mostazafeen; Vahed-e Basij Mostaza'feen; National Mobilization Organization; National Resistance Mobilization; Resistance Mobilization Force; Nirooye Moghavemate Basij; Niruyeh Moghavemat Basij; IRGC Air Force; Islamic Revolution Guards Corps Air Force; Islamic Revolutionary Guards Corps Air Force; Islamic Revolutionary Guard Corps Air Force; IRGCAF; Sepah Pasdaran Air Force; Air Force, IRGC (Pasdaran); Islamic Revolutionary Guards Corps Aerospace Force; Aerospace Force of the Army of the Guardians of the Islamic Revolution; AFAGIR; Aerospace Division of IRGC; IRGC Aerospace Force; IRGCASF; IRGC Navy; Islamic Revolution Guards Corps Naval Force.

petroleum products for the financial benefit of the IRGC-QF." https://home.treasury.gov/news/press-releases/sm1165.[2]

20.     The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States, affecting U.S. commerce.  The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

    a.    In likely retaliation for the death of former IRGC-QF commander Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed plot to commit murder-for-hire and provide material support to a transnational murder plot targeting former National Security Advisor John Bolton. https://www.justice.gov/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

    b.    In 2021, "[t]hrough the IRGC-QF, Iran continued its support to several U.S.-designated terrorist groups, providing funding, training, weapons, and equipment to various groups within the region. . . . Iran-backed militias continued sporadic attacks on [the U.S.] Embassy [in] Baghdad and bases hosting U.S. and other Defeat-ISIS forces in Iraq and Syria[.]" State Dep't 2021 Country Reports on Terrorism, at 125-26, available at: https://www.state.gov/wp-content/uploads/2023/02/Country_Reports_2021_Complete_MASTER.no_maps-011323-Accessible.pdf.

---

[2]     Iranian media reported that Qasemi died in December 2022. https://english.alarabiya.net/News/middle-east/2022/12/08/Ex-Iran-oil-minister-and-IRGC-commander-Rostam-Ghasemi-dies.

c.    In 2021, "Iran pursued or supported terrorist attacks against Israeli targets in 2021, including . . . a January bomb attack outside the Israeli embassy in New Delhi for which the Indian government said the IRGC-QF was responsible[.]" *Id.* at 215.

d.    From 2006 to 2009, a series of terrorist attacks by a group funded and supplied by the IRGC-QF killed or severely injured U.S. military servicemembers and civilians. *See Neiberger v. Islamic Republic of Iran*, Civ. A. No. 16-2193 (EGS/ZMF), 2022 WL 17370239, at *1 (D.D.C. Sept. 8, 2022).

e.    In 2007, the IRGC-QF continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that killed thousands of U.S. forces, and explosively formed penetrators that have a higher lethality rate than other types of improvised explosive devices, and were specially designed to defeat armored vehicles used by U.S. forces in Iraq, *see Burks v. Islamic Republic of Iran*, Civ. A. No. 16-1102 (CRC), 2020 WL 13303322, at *2 (D.D.C. Aug. 21, 2020).

f.    In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/; *see also Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 488 (D.D.C. 2021) (Mehta, J.).

g.    In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010). IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack. *Id.*

21.     Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and abroad.  Indeed, a major purpose of the IRGC and IRGC-QF's campaigns of terror is to thwart the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries.  *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States").  These terrorist activities undertaken in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

**B.      National Iranian Oil Company and Its Affiliates**

22.     The Iranian Ministry of Petroleum oversees NIOC, which "is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran." https://home.treasury.gov/news/press-releases/sm1165.

23.     As one court has noted, "NIOC is one of the world's largest oil companies and generates billions of dollars in revenue each year[.]" *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 110 (D.D.C. 2021) (Moss, J.) (cleaned up).  "[I]t functions primarily as a commercial entity aimed at the production and sale of oil." *Est. of Fishbeck v. Islamic Republic of Iran*, Civ. A. No. 18-2248 (CRC), 2021 WL 6808189, at *3 (D.D.C. Mar. 1, 2021).

24.     According to OFAC, NIOC is "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's [IRGC-QF] and its terrorist proxies." https://home.treasury.gov/news/press-releases/sm885.  Indeed, NIOC "after funding its own operations and making investments in Iran's oil industry, its revenue goes to fund the Iranian government[,]" which "depending on the price of oil, revenue from NIOC is between one-third

and two-thirds of the Iranian government's total revenue." *Holladay*, 523 F. Supp. 3d at 110 (quoting declaration).

25.    OFAC has found that NIOC supplies crude oil and condensate sold by the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm767.

26.    On September 24, 2012, the U.S. Department of the Treasury submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012, finding that NIOC was an agent or affiliate of the IRGC. *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

27.    On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." https://home.treasury.gov/news/press-releases/sm1165.

28.    In designating and reporting on the activities of NIOC, the Treasury Department made clear that NIOC's efforts are not limited to the domestic borders of Iran, but instead, NIOC undertakes efforts in foreign commerce contrary to the interests of the United States. For example:

a.    in designating NIOC, OFAC noted that NIOC engaged in foreign commerce with the "illegitimate Maduro regime in Venezuela," including by "charter[ing] multiple vessels to support the transport of tens of thousands of metric tons of gasoline destined for Venezuela[,]" *id.*;

b.    in designating entities working with NIOC, OFAC noted that NIOC worked with such entities to facilitate shipments of Iranian petroleum to foreign customers of NIOC, *see* https://home.treasury.gov/news/press-releases/jy1115;

c.     NIOC has entered into fossil fuel supply contracts with foreign organizations, committing itself to provide energy products to foreign companies, *see, e.g.,* Compl. ¶¶ 1-2, 10-15, *Crescent Petroleum Co. v. Nat'l Iranian Oil Co.*, Civ. A. No. 22-1361 (JMC) (D.D.C. filed May 16, 2022), ECF No. 1, and using U.S. dollars to transact its business, *id.* ¶ 37; *see also id.*, ECF No. 1-6 at 23; and

d.     NIOC has entered into agreements to develop oil and gas fields with a Russian-owned energy company, Gazprom, which OFAC has designated under Executive Order 14,0424, as being Russian-government affiliated entities.  *See* https://www.reuters.com/business/energy/iran-russias-gazprom-sign-primary-deal-energy-cooperation-2022-07-19/

29.     NIOC's use of foreign commerce to fund and provide material support to the IRGC and IRGC-QF thwart U.S. interests not just by providing a means to finance the wrongful actions of the IRGC and IRGC-QF, which plainly affect commerce with the United States, but also by providing support to regimes hostile to U.S. interests, including Russia.  *See Sealed Case*, 936 F.3d at 589-50 (foreign commerce power allows Congress to outlaw activities "that lends financial support to terrorist organizations in foreign countries when that support merely 'affects' commerce with the United States").  These activities undertaken in foreign commerce plainly have a domestic effect on the United States and its domestic commerce.

30.     NIOC operates through itself and several subsidiaries or components, including Naftiran Intertrade. OFAC has included Naftiran Intertrade on its SDN List and identified it as being owned or controlled by the Iranian government pursuant to Executive Order 13,599.  *See* https://home.treasury.gov/news/press-releases/hp1299.

31.    Naftiran Intertrade is a key player in Iran's energy sector and historically has purchased most of Iran's gasoline imports. *See* Time, *Sleeping with the Enemy: BP's Deals with Iran*, available at https://web.archive.org/web/20100618113610/http://www.time.com/time/nation/article/0,8599,1996921,00.html (Jun. 16, 2010).

32.    On or about January 23, 2020, OFAC designated the Triliance Petrochemical Company ("Triliance") pursuant to Executive Order 13,864. "In 2019, Triliance ordered the transfer of the equivalent of millions of dollars to NIOC as payment for Iranian petrochemicals, crude oil, and petroleum products shipped to the United Arab Emirates and China after the expiration of any applicable significant reduction exceptions. In facilitating these shipments, Triliance worked to conceal the Iranian origin of these products. Triliance has also facilitated the sale of millions of dollars' worth of petroleum products involving Naftiran Intertrade Company, a subsidiary of NIOC, to companies in China." https://home.treasury.gov/news/press-releases/sm885.

## II.    **Importance of Petroleum and Shipping Industries to the IRGC.**

33.    OFAC has observed that the IRGC-QF deliberately utilizes a "complex network of intermediaries," including "dozens of ship managers, vessels, and facilitators," for the purpose of "obfuscate[ing] its involvement in selling Iranian oil." https://home.treasury.gov/news/press-releases/sm767.

34.    In spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly ten million barrels of crude oil and had taken steps to hide Iranian, IRGC, and NIOC involvement in certain transactions. *Id.* These shipments, taken collectively, sold for more than half a billion dollars. *Id.* The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars. *Id.*

35.     In designating NIOC and NITC under Executive Order 13,224, OFAC reported: "NIOC and NITC provide both the oil and tankers for the sale of Iranian oil by the IRGC-QF." https://home.treasury.gov/news/press-releases/sm1165.    "The cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF." *Id.*

36.     According to OFAC, the IRGC uses the proceeds from its involvement in the oil industry and other sectors of the Iranian economy to "support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad." https://home.treasury.gov/news/press-releases/sm703.

37.     OFAC has reported that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and fund[] its malign activities throughout the Middle East."   https://home.treasury.gov/news/press-releases/sm885.    Government officials have also noted: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities and enable its persistent use of violence against its own people." *Id.*

**III.    The Petroleum Product Was Iranian Petroleum and Was Peddled in Foreign Commerce in Furtherance of the Illicit Activities of the Iranian State Actors.**

38.     The Petroleum Product originated from Iran.

39.     Through a series of transfers and the use of surreptitious means, the Petroleum Product ultimately found its way into storage at the JANAF facility in Omišalj, Croatia.

**A.     The Petroleum Product Was Loaded Onto BERG I from Kharg Island, Iran.**

48.     Motor Tanker ("M/T") Berg 1 (International Maritime Organization ("IMO") 9262168) ("Berg 1") is a VLCC flagged in Panama. The vessel has loaded oil at Kharg Island, Iran on seven occasions over the past two years.  Berg 1 has transported at least 13.5 million barrels for ultimate delivery to China via ship-to-ship ("STS") transfers in the Riau Archipelago— a geographic term for the core group of islands within the Riau Islands Province in Indonesia, located south of Singapore and east of Riau on Sumatra.  During the tenure of Berg 1's current ownership (as publicly reported), Berg 1 has only loaded oil in Iran.  Berg 1 mostly loads at Kharg Island but has also been seen engaged in STS transfers as an oil cargo recipient in the Gulf of Oman off the coast of Iran.

49.     On or about January 15, 2022, Berg 1's reported location as per its automatic identification system ("AIS") showed it at the intersection of Kuwait, Iraq, and Iran territorial waters. Thereafter, Berg 1 transmitted false AIS data (also known as "spoofing") regarding its location.

50.     Contrary to its spoofed AIS at the time, on or about January 16, 2022, Berg 1 was loading at the south berth (a/k/a berth 5) on the "T" jetty of Kharg Island, Iran.  The loading continued until on or about January 18, 2022.

51.     Thereafter, on or about January 18, 2022, Berg 1 departed Iran and began reporting her true position over AIS, which was southbound heading away from Kharg Island.

52.     On or about January 18, 2023, Berg 1 reported a change in destination to Singapore, then to Singapore "outside port limits" (or "OPL"), followed by a change in draft depth from 11.5 meters to 20.2 meters, then to 20.5 meters.

- 14 -

**B.    The Petroleum Product Transferred Via STS to a Series of Other Tankers, Including the Maria Grace.**

53.    On or about February 2, 2022, Berg 1 arrived in the Riau Archipelago to carry out STS transfers of oil.

54.    From on or about February 15, 2022, until on or about February 17, 2022, Berg 1 was engaged in an STS transfer to deliver her oil cargo to Maria Grace (IMO 9224271) in the Riau Archipelago. No draft changes were reported at this time by either of the two vessels.

55.    From on or about February 18, 2022, until on or about February 20, 2022, Berg 1 was engaged in another STS transfer to deliver oil cargo to Tjatse (IMO 9248813) in the Riau Archipelago.

56.    On or about February 21, 2022, Berg 1 reported a change in destination to Khor Fakkan, United Arab Emirates, and indicated her draft depth went from 20.5 meters (fully laden) to 11 meters (empty of cargo/in ballast).  Correspondingly, on February 28, 2022, Tjatse reported a draft change from 8.8 meters (empty of cargo/in ballast) to 15.7 meters (fully laden), and on March 12, 2022, Maria Grace reported a draft change from 9.1 meters (empty of cargo) to 15.7 meters (fully laden).

57.    On March 12, 2022, Maria Grace departed the Riau Archipelago for Nipa anchorage, Indonesia.  As stated above, the vessel reported a draft change the same day. Thereafter, Maria Grace departed from Nipa anchorage and headed towards CS Prosperity (IMO 9169691), which was anchored off Kukup, Malaysia.

**C.    The Petroleum Product Transferred Via STS from Maria Grace to CS Prosperity.**

58.    From on or about March 15, 2022, until on or about March 18, 2022, Maria Grace was engaged in an STS transfer delivering the Petroleum Product to CS Prosperity off Kukup in the Strait of Malacca.

59.     On or about March 18, 2022, CS Prosperity ended the STS transfer with Maria Grace at 09:12 UTC.

**D.     The Petroleum Product Transferred Via STS from CS Prosperity to Okeanos.**

60.     Also, on or about March 18, 2022, just 71 minutes after receiving oil from Maria Grace, CS Prosperity engaged in an STS with Okeanos (IMO 9232931).

61.     On or about March 19, 2022, CS Prosperity continued the STS to transfer the Petroleum Product to Okeanos off Kukup in the Strait of Malacca. AIS transponders of both vessels truthfully reported each being in this location at this time.

62.     On or about March 21, 2022, Okeanos reported a change in draft from 9 meters (empty of cargo/in ballast) to 16 meters (laden) before ending the STS transfer and departing for Omišalj, Croatia via the Suez Canal.

**E.     The Petroleum Product Was Loaded Into Storage at JANAF in Croatia and Thereafter Sold.**

63.     On or about April 22, 2022, Okeanos arrived at Omišalj, Croatia docking at the OMI1 berth to deliver the Petroleum Product.

64.     On or about April 22, 2022, until on or about April 24, 2022, the Petroleum Product unloaded from OKEANOS was stored in tanks controlled by JANAF.  The Petroleum Product was stored by "Entity 1," a Swiss entity acting on behalf of Triliance and the purported owner of the Petroleum Product.

65.     On or about April 24, 2022, Okeanos departed Omišalj, Croatia.

66.     On or about June 12, 2024, Entity 1 sold the Petroleum Product to an international company.  That international company thereafter sold the Petroleum Product to another

international company. The proceeds of the sale between the two international companies (i.e., the Defendant Property) were thereafter seized by the United States.

**IV.    Triliance Has Repeatedly Peddled Iranian Petroleum Products Through Front Companies and Has Undertaken Deception to Hide its Activities.**

40.    In conducting its businesses, Triliance operates through affiliates or other business names, including Entity 1. Since early 2022, Entity 1 has exclusively done business on behalf of Triliance, selling oil products produced in Iran. To obfuscate its involvement in the transaction, Triliance used Entity 1 and other front companies to do business because it had been designated by OFAC.

41.    Since the late-2010s, Triliance has been run by Ali Bayandorian, as its operating manager.

42.    In his role as operating manager, Bayandorian furthered the affairs of Triliance's petroleum trading business, and ultimately Iran's oil production and sale, including by arranging transactions with purchasers and sellers.

43.    From at least early 2022 until the present, Bayandorian has routinely engaged in Iranian petroleum transactions as part of the Triliance network, using a myriad of front companies to represent Triliance in business dealings and to sell Iranian oil.

44.    For example, in early 2022, Bayandorian convinced Entity 1's owner to begin to do all its business on behalf of Bayandorian and Triliance, essentially agreeing to provide Entity 1's owner with Iranian oil products on credit and allow the profits of sales to be maintained in bank accounts kept by Entity 1's owner.

45.    Regarding the Croatian oil transaction, Bayandorian intended to store the Petroleum Product in Croatia to increase the marketability of the Petroleum Product to Europe, and potentially to establish a future purchasing stream to European buyers.

46.    Regarding the Croatian oil transaction, in April 2022, Bayandorian caused false documents to be produced and passed to inspecting parties, which asserted that the Petroleum Product originated in Malaysia, to obfuscate the true origin of the oil.

47.    Among those documents were bills of lading and source origin reports falsely claiming to be from the "Malaysian Chamber of Commerce," which were provided to port authorities in Croatia and JANAF.

48.    In fact, at all relevant times, Triliance, Bayandorian, and Entity 1 all knew that the Petroleum Product originated in Iran and acted with an intent to conceal that fact from entities and individuals involved in the transaction, to include JANAF, the Croatian port authorities, potential buyers, and U.S. financial institutions.

## COUNT ONE – FORFEITURE
### (18 U.S.C. § 981(A)(1)(G)(I))

49.    The United States incorporates by reference the allegations set forth in Paragraphs 1 through 48 above as if fully set forth herein.

50.    Under the alternative theories described below, the Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(G)(i).

**A.    The Defendant Property Is the Proceeds of Property of NIOC or its Subsidiaries, Which Have Perpetrated and Are Perpetrating a Federal Crime of Terrorism.**

51.    The Defendant Property is the proceeds of property of NIOC or its subsidiaries, which has perpetrated a federal crime of terrorism themselves, namely knowingly providing material support to a designated terrorist organization.

52.    In transferring the Petroleum Product, of which the Defendant Property is the proceeds, for the purposes of sale, NIOC and its subsidiaries provided or attempted to provide resources to IRGC or IRGC-QF, in violation of 18 U.S.C. § 2339B(a)(1).

53.     18 U.S.C. § 2339B prohibits persons from knowingly providing material support or resources to a foreign terrorist organization or conspiring to do so.

54.     As noted above, the IRGC and IRGC-QF are foreign terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189.

55.     As described above, by selling or facilitating the sale of the Petroleum Product, NIOC and its subsidiaries knowingly sought to aid the IRGC and IRGC-QF by providing a source of funding to them.

56.     NIOC and its subsidiaries knowingly provided material support to the IRGC and IRGC-QF in foreign commerce as NIOC and its subsidiaries sought to peddle the Petroleum Product to foreign purchasers, including using doctored records from a foreign country.

57.     NIOC and its subsidiaries' use of foreign commerce to provide material support to the IRGC and IRGC-QF has a sufficient nexus to the United States as the IRGC and IRGC-QF's wrongful actions affect U.S. commerce, including by killing U.S. nationals, and the introduction of billions of dollars of oil annually into the black market has predictable effects on the price of petroleum and other fossil fuels in the United States as crude oil and other fossil fuels are global commodities

58.     The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as the proceeds of an asset of an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

**B.     The Defendant Property Is the Proceeds of Property of NIOC or its Subsidiaries, Which Afford Them a Source of Influence Over the IRGC an IRGC-QF.**

59.     The Defendant Property is the proceeds of property of NIOC or its subsidiaries, which affords them a source of influence over the IRGC and IRGC-QF, entities which have engaged in federal crimes of terrorism.

60.     As noted above, the IRGC and IRGC-QF are foreign terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189.

61.     The IRGC and IRGC-QF have committed numerous terrorism-related offenses identified in 18 U.S.C. § 2332b(g)(5), including killing and attempting to kill U.S. personnel as proscribed by 18 U.S.C. § 1114.

62.     NIOC and its subsidiaries' efforts to sell and facilitate the sale of the Petroleum Product were critical to furthering the affairs of the IRGC and IRGC-QF as "the profits from Iran's oil industry are its 'financial lifeline.'" *United States v. All Petrol.-Prod. Cargo Aboard the Bella*, Civ. A. No. 20-1791 (JEB), 2021 WL 4502056, at *4 (D.D.C. Oct. 1, 2021).  Indeed, such activities concerning the Petroleum Product were used to further the affairs of the IRGC and IRGC-QF's terrorist enterprise and to make their prohibited conduct less difficult.

63.     The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

**C.     Alternatively, the Defendant Property is the Proceeds of Property of Triliance, Which Affords It a Source of Influence Over NIOC and Its Subsidiaries, as well as Over the IRGC and the IRGC-QF.**

64.     Alternatively, the Defendant Property is the proceeds of property of Triliance, which affords it a source of influence over NIOC and its subsidiaries, as well as over the IRGC, and IRGC-QF, entities which have engaged in federal crimes of terrorism.

65.     As noted above, the IRGC and IRGC-QF are foreign terrorist organizations designated as such by the State Department under INA Section 219, 8 U.S.C. § 1189, and that have committed federal crimes of terrorism identified in 18 U.S.C. § 2332B(g)(5).

- 20 -

66.     As noted above, NIOC and its subsidiaries have themselves engaged in planning or perpetrating a federal crime of terrorism, namely knowingly providing material support to the IRGC and IRGC-QF.

67.     Triliance marketing and attempting to sell the Petroleum Product was critical to furthering the affairs of the IRGC and IRGC-QF.  "[T]he profits from Iran's oil industry are its 'financial lifeline.'"  *Bella*, 2021 WL 4502056, at *4.  Indeed, without firms acting as purchasers of Iranian-sourced petroleum, efforts to obtain financing for the terrorist activities of the IRGC and IRGC-QF would fail.  Accordingly, were the Defendant Property the proceeds of the property of Triliance, Triliance's purchase of the Iranian-sourced petroleum enabled the prohibited conduct of NIOC, its subsidiaries, as well as the IRGC and IRGC-QF.

68.     The Defendant Property is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) as affording a person a source of influence over an entity or organization engaged in planning or perpetrating a federal crime of terrorism.

*   *   *

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Property be forfeited to the United States for disposition according to law; and that the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: March 26, 2025
       Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By: _____/s/ Brian P. Hudak_____
     BRIAN P. HUDAK
     Chief, Civil Division, U.S. Attorney's Office
     601 D Street, NW
     Washington, DC 20530
     (202) 252-2500 (main)

*Attorneys for the United States of America*

## <u>VERIFICATION</u>

I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture In Rem is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct. Executed on this 26th day of March 2025.


_____*/s/ Cindy Burnham*_____
Special Agent Cindy Burnham
Federal Bureau of Investigation


I, Matthew Harris, a Special Agent with the Department of Homeland Security, Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture In Rem is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct. Executed on this 26th day of March 2025.


_____*/s/ Matthew Harris*_____
Special Agent Matthew Harris
Homeland Security Investigations